**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BRUCE WEED, ET AL.,** | : | |
| **Plaintiffs,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **NO. 11-2808** |
| **ALLY FINANCIAL INC.,** | : | |
| **Defendant.** | : | |

**MEMORANDUM AND ORDER**

**Tucker, J.**                                                                **August _____, 2011**

Presently before this Court is Defendant's Motion to Dismiss (Doc. 12), Plaintiffs'

Response in Opposition thereto (Doc. 21), and Defendant's Reply (Doc. 25).  For the reasons set

forth below, the Court grants Defendant's Motion in part and denies it in part.

**I.  FACTUAL BACKGROUND**

Plaintiffs initiated this breach of contract and tort action against Defendant for allegedly

engaging in bad faith conduct by targeting automobile dealerships, including their dealership, for

termination, foreclosure, and liquidation in violation of the Pennsylvania Uniform Commercial

Code and Pennsylvania common law.

Plaintiff Weed Chevrolet Company, Inc. ("Weed Chevrolet") is a Pennsylvania

corporation that previously operated a motor vehicle dealership in Bristol, Pennsylvania.

Plaintiff Bruce Weed, an individual residing in Pennsylvania, is President/CEO and a 33 1/3%

stockholder of Weed Chevrolet.  Plaintiff Michael David Weed, an individual residing in New

Jersey, is Vice President and a 33 1/3% stockholder of Weed Chevrolet.  Plaintiff Scott Weed, an

individual residing in Pennsylvania, is Secretary and a 33 1/3% stockholder of Weed Chevrolet.

Plaintiff Weed[3] Properties, LLC ("Weed3 Properties") is a Pennsylvania limited liability company, in which the Weed Family are sole members.  Defendant Ally Financial, Inc., formerly known as, inter alia, GMAC, Inc., ("GMAC") is a Delaware corporation that conducted business in Pennsylvania in connection with the transactions that are the subject of this action.

The facts giving rise to Plaintiffs' Complaint in the light most favorable to Plaintiffs are as follows.  At all relevant times, GMAC provided wholesale inventory financing for the General Motors Corporation ("GM") dealership network, including floorplan and retail financing for Weed Chevrolet.  Weed Chevrolet entered into its first financing agreement with GMAC in 1926, when GMAC was wholly owned by GM.  Until the dealership closed in 2008, Plaintiff alleges that it was never in default or out of trust with GMAC.

Weed Chevrolet operated under a floorplan financing agreement with GMAC under the standard GMAC Wholesale Security Agreement ("WSA").  According to the WSA, GMAC was obligated to provide floorplan financing to Plaintiffs so long as Plaintiffs were not in default. Weed Chevrolet also had a Revolving Line of Credit Agreement ("RCA") with GMAC.  In 2007, GMAC expanded the RCA from $200,000 to $350,000 and granted Weed Chevrolet a Commercial Real Estate Loan of $600,000 to enable the dealership to enhance its operations. The WSA, real estate loan and RCA were secured by a first and second mortgage ("collectively, the "Mortgage") on the real estate where Weed Chevrolet was located, which was owned by Weed Properties.  The Weed family also personally guaranteed all amounts due under the Real Estate Loan.  On September 28, 2007, the parties entered into a Cross-Default, Cross-Collateralization and Guaranty Agreement ("Cross Collateralization Agreement") covering all of the agreements.

In November 2006, GM finalized the sale of a 51% share of GMAC to a consortium of investors led by Cerebus Capital Management, LP, a private equity firm based in New York. After the sale, GMAC expanded the scope of its financing to include residential homes and other forms of consumer financing, ultimately becoming one of the largest sub-prime mortgage lenders in the country.  With the collapse of the sub-prime mortgage industry in 2008, GMAC suffered an internal liquidity crisis.  According to Plaintiffs, in an effort to address this crisis, GMAC undertook a massive program to terminate financing to more than 1,000 GM dealers, stripping those dealers of their associated collateral and closing down their financing, irrespective of whether the targeted dealers were in default.  Plaintiffs allege that Weed Chevrolet was one of those targeted dealers.

In June 2008, GMAC reduced Weed Chevrolet's floorplan financing and reduced the RCA from $350,000 to $225,000.  At the same time, GMAC claimed that due to performance issues, it would terminate financing by August 15, 2008 unless Weed Chevrolet submitted an acceptable business plan showing that it was reducing costs and improving performance. According to Plaintiff, when this threat was made, Weed Chevrolet was performing at levels consistent with its historical performance for that time of year and had already implemented a cost reduction program for 2008.

In July 2008, GMAC demanded that Weed Chevrolet deposit $125,000 in additional working capital by August 15, 2008 and an additional $125,000 in additional working capital by September 15, 2008.  Plaintiffs sold inventory at a loss to generate immediate cash and used their personal assets to meet the additional working capital demands.

In October 2008, GMAC demanded that Weed Chevrolet make accelerated payments on

all inventory and reduced its financing on all used vehicles.  Neither of these demands was

consistent with the WSA.  Moreover, Plaintiffs were not in default on any agreements at the time

the demands were made.  To meet the new demands, Weed Properties and the Weed family

proposed a deal to sell the real estate where Weed Chevrolet was located.  Plaintiffs found an

interested buyer and submitted the contract to GMAC for approval, but GMAC never responded.

In the same month, GMAC notified Plaintiffs that it was terminating the RCA.  GMAC

then gave Weed Chevrolet a 90-day notice that it was unilaterally terminating the WSA and

would be ending all floorplan financing as of January 21, 2009.   Left with no alternative, Weed

Properties ultimately sold the real estate where the dealership was located with a fair market

value of $6 million at a distressed price of $3.2 million.   Weed Chevrolet also sold its dealership

assets with a fair market value of $1.5 million at a distressed price of less than $100,000.  The

Weed family also drained personal assets to come up with the cash demanded by GMAC and

avoid new penalties GMAC threatened to impose.  Ultimately, Weed Properties had to borrow

$1.15 million from a local bank to wind down the dealership and make accelerated payments to

GMAC.

Plaintiffs contend that Defendant misled them and other targeted dealers into the

mistaken, but reasonable, belief that if they acceded to Defendant's demands, Defendant would

continue to provide financing essential for them to stay in business.  Plaintiff alleges that

Defendant extorted accelerated principal payments and increased interest rates, additional

collateral, penalty fees and other cash payments from the targeted dealers, even dealers who were

not in default, by threatening to terminate the dealers' wholesale and retail financing agreements

and seize their entire inventories unless the dealers complied.  Plaintiffs contend that, in the

4

absence of an actual default on any of the agreements, Defendant manufactured default as a

pretext.  According to Plaintiffs, Defendant knew, but did not disclose, that once it forced the

dealers to give Defendant everything they had, Defendant would terminate their financing and

put them out of business.

## II.  PROCEDURAL HISTORY

On April 27, 2011, Plaintiffs filed a Complaint (Doc. 1) containing the following four

counts: breach of contract and breach of implied covenant of good faith and fair dealing; tortious

interference with contractual relations; fraud; and negligent misrepresentation.  Plaintiffs seek

compensatory damages, including consequential damages; punitive damages; interest; and

damages for the Weed Family's pain and suffering.  On June 3, 2011, Defendant filed a Motion

to Dismiss (Doc. 12).  On July 20, 2011, Plaintiffs filed a Response in Opposition thereto (Doc.

21).  On July 28, 2011, Defendant filed a Reply (Doc. 25).  The Court now addresses this

pending motion.

## III.  LEGAL STANDARD

On a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil

Procedure 12(b)(6), the court is required to accept as true all allegations in the complaint and all

reasonable inferences that can be drawn therefrom, and to view them in the light most favorable

to the non-moving party.  See Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384

(3d Cir. 1994).  A complaint should be dismissed only if the alleged facts, taken as true, fail to

state a claim.  See In re Warfarin Sodium Antitrust Litig., 214 F.3d 395, 397–98 (3d Cir. 2000).

In making this determination, the question before the court is not whether the plaintiff will

ultimately prevail, but whether the plaintiff can prove any set of facts consistent with his or her

allegations that will entitle him or her to relief. <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974) (explaining that the Court's role is limited to determining whether a plaintiff is entitled to offer evidence in support of her claims); <u>Semerenko v. Cendant Corp.</u>, 223 F.3d 165, 173 (3d Cir. 2000).

While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. <u>Morse v. Lower Merion Sch. Dist.</u>, 132 F.3d 902, 906 (3d Cir. 1997). Though detailed factual allegations are not required, the United States Supreme Court has recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle [ment] to relief' requires more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007). In <u>Twombly</u> the Court made clear that it would not require a "heightened fact pleading of specifics," but only "enough facts to state a claim to relief that is plausible on its face." <u>Id.</u> at 570. A "pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.' " <u>Kost v. Kozakiewicz</u>, 1 F.3d 176, 183 (3d Cir. 1993) (citation omitted).

In 2009 the United States Supreme Court revisited the requirements for surviving a 12(b)(6) motion to dismiss in <u>Ashcroft v. Iqbal</u>,129 S.Ct. 1937, 1950 (2009). There the Court made clear that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements [are] not suffice" to defeat a Rule 12(b)(6) motion to dismiss. Id. at 1949. In evaluating whether a Plaintiff has met the pleading requirements, a district court must identify "the 'nub' of the ... complaint—the well-pleaded, nonconclusory factual allegation [s]." <u>Id.</u>

"[O]nly a complaint that states a plausible claim for relief [will] survive[ ] a motion to dismiss." Id. at 1950.

In light of the decisions in Twombly and Iqbal, the Third Circuit set forth a two-part analysis to be applied by district courts when presented with a 12(b)(6) motion. First, the court must separate the legal elements and factual allegations of the claim, with the well-pleaded facts accepted as true but the legal conclusions disregarded.  Fowler v. UPMC Shadyside, 578 F.3d 203, 210–11 (3d Cir. 2009). Second, the court must determine whether the facts alleged in the complaint demonstrate that the plaintiff has a "plausible claim for relief." Id. at 211.

The defendant bears the burden of establishing that a plaintiff's complaint fails to state a claim. See Gould Elecs. v. United States, 220 F.3d 169, 178 (3d Cir. 2000).

## IV.  DISCUSSION

Defendant first contends that Counts II, III, and IV of Plaintiffs' Complaint should be dismissed on the grounds that the three torts alleged contravene Pennsylvania's gist of the action doctrine.  Under that doctrine, a plaintiff is precluded from recovering in tort for claims that actually sound in contract. The doctrine bars tort claims: (1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract. eToll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10, 19 (Pa. Super.2002).  The gist of the action doctrine is applied to maintain the conceptual distinction between the theories of breach of contract and tort by preventing a plaintiff from recasting ordinary breach of contract claims as tort claims. Bash v. Bell Tel. Co. of Pennsylvania, 601 A.2d 825, 829 (Pa. Super.1992)

("Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals.... To permit a promisee to sue his promisor in tort for breaches of contract inter se would erode the usual rules of contractual recovery and inject confusion into our well-settled forms of actions."). "When a plaintiff alleges that the defendant committed a tort in the course of carrying out a contractual agreement, Pennsylvania courts examine the claim and determine whether the 'gist' or gravamen of it sounds in contract or tort." Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc., 40 F. Supp.2d 644, 651 (W.D. Pa. 1999).

As an initial matter, the Court notes that in Plaintiffs' claim in Count I for Breach of the Implied Covenant of Good Faith and Fair Dealing, Plaintiffs allege in the Complaint that GMAC breached its obligation to perform in good faith with respect to all of loan agreements by manufacturing a purported default as a pretext for putting Plaintiffs out of business under the guise of loan enforcement.[1]  Plaintiffs allege that GMAC acted in bad faith and in a manner that was not commercially reasonable under the circumstances by failing to extend funds pursuant to the various agreements, by wrongfully accelerating repayment, and by forcing Plaintiffs into default.

With respect to Plaintiff Weed Chevrolet's claim in Count II for tortious interference with contractual relations, the Court denies Defendant's motion to dismiss.  Plaintiffs allege in the Complaint that GMAC directly interfered with Weed Chevrolet's business relationship with GM and interfered with Plaintiff's rights under the GM Agreement. Specifically, Plaintiffs allege that

---

[1]  Count I in Plaintiffs' Complaint also includes a claim for Breach of Contract, but Defendant has not raised any issues in it Motion to Dismiss with respect to this claim.

GMAC was well aware that abruptly terminating its lending relationship with Weed Chevrolet would directly interfere with Weed Chevrolet's ongoing contractual relations with GM and destroy its business. Plaintiffs further allege that GMAC's actions were purposeful and specifically intended to harm the existing relationship between GM and Weed Chevrolet. Here, the Court finds that Weed Chevrolet's tortious interference claim does not arise from any agreement between Plaintiffs and GMAC. Rather, such claim arises from GMAC's interference with Plaintiffs' contract with GM as a dealer of GM vehicles, a relationship wholly distinct from that between Plaintiffs and GMAC. See Mente Chevrolet Oldsmobile, Inc. v. GMAC, No. 5:08-cv-2403-JS, Order, Dkt. #29 (E.D. Pa. Apr. 15, 2009) (in context of nearly identical dealer termination case against GMAC, district court denied GMAC's motion to dismiss plaintiffs' claim for, among other things, tortious interference with business relations).

With respect to Plaintiffs' claims in Count III for fraud, the Court denies Defendant's motion to dismiss. Courts have found exceptions to the gist of the action doctrine where the fraud concerns an act collateral to the parties' contract. See Mill Run Assocs. v. Locke Prop. Co., 282 F. Supp. 2d 278, 290-91 (E.D. Pa. 2003) (refusing to dismiss fraud claims based on gist-of-the-action grounds where plaintiff alleged that he was fraudulently induced "to continue under the terms of the Agreement"); Sullivan v. Chartwell Inv. Partners, LP, 873 A.2d 710, 718 (Pa. Super.2005) (holding that tort claims relating to appellee's fraudulent promises that induced appellant to enter employment contract would not be barred because they were collateral to the contract). Here, the misrepresentation alleged in the Complaint is that GMAC fraudulently induced Plaintiffs to inject an additional $250,000 into Weed Chevrolet, to assign their GM Open Account, and to make accelerated principal payments, all with the intention of later forcing

Plaintiffs into default and extracting as much cash as possible from Plaintiffs.  Because Plaintiffs were fraudulently induced to continue under the contracts with GMAC by injecting additional capital, their claims are not barred by the gist of the action doctrine.

With respect to Plaintiffs' claim in Count IV for negligent misrepresentation, the Court grants Defendant's motion to dismiss.  The allegations underlying this count essentially mirror those pertaining to Count I for the Breach of the Implied Covenant of Good Faith and Fair Dealing and are barred by the gist of the action doctrine.  Any duty or obligation Plaintiffs allege as a basis for their claim for negligent misrepresentation flow from the various agreements between the parties.  The specific conduct complained of - making false statements and purposefully concealing material facts - are all alleged to have taken place in the course of executing and carrying out the relevant contracts.  As such, the gravamen of this claim sounds in contract.  See e.g., Horizon Unlimited, Inc. v. Silva, WL 88391 (E.D.Pa. Feb. 26, 1998) (concluding that gist of the action doctrine barred negligent misrepresentation claim premised on allegedly false statements made in promotional literature).

Defendant also contends that and the three torts listed in Counts II, III, and IV of Plaintiffs' Complaint are also time-barred by Pennsylvania's two-year statute of limitations. Having found that Count IV must be dismissed pursuant to the gist of the action doctrine, the Court need only address the statue of limitations argument as it pertains to Counts II and III. Here, the Court rejects Defendant's argument and finds Plaintiffs' Complaint sufficiently pleads that the statute of limitations on the tort claims did not begin to run until discovery. "Where the statutory period has expired, the discovery rule triggers the tolling of the statute of limitations when the plaintiff is unable, despite the exercise of reasonable diligence, to discover the injury or

its cause." Kernaghan v. American Tower Corp., No. 09-4371, 2010 WL 3522133, at *4 (E.D. Pa. Sept. 8, 2010).  On the face of the Complaint, Plaintiffs allege that they did not learn, and despite reasonable diligence could not have known, of the fraud and tortious interference claims until the fall of 2010, well within Pennsylvania's two-year statute of limitations.  Construing the facts in the light most favorable to Plaintiffs, and particularly considering the early stage of the litigation, Plaintiffs' allegations are sufficient to survive a motion to dismiss.  See, e.g., Longview Dev. LP v. Great Atl. & Pac. Tea Co., Inc., 2004 WL 1622032, at *4 (E.D. Pa. Jul. 20, 2004) (noting courts' hesitation to dismiss claims for fraud in the inducement based on gist of the action doctrine early in the litigation); Little Souls, Inc. v. State Auto Mut. Ins. Co., 2004 WL 503538, at *3 (E.D. Pa. March 15, 2004) (allowing fraud claim to survive motion to dismiss even though the court conceded that after discovery the gist of the action doctrine may bar the claim).

On the issue of whether Plaintiffs can recover punitive damages, the Court finds that punitive damages may not be recovered on Plaintiffs' breach of contract claim, but may be recovered on the remaining tort claims.  See Reliance Universal, Inc. of Ohio v. Ernest Rends Contracting Co., 454 A.2d 39, 44 (Pa. Super. 1982) ("Indeed the law is clear that punitive damages are not recoverable in contract actions."); Daniel Adams Associates v. Rimbach Publishing Inc., 429 A.2d 726, 728 (Pa. Super. 1981) (where the defendant's conduct gives rise to an independent tort claim that punitive damages may be available).

Lastly, the Court finds that the Plaintiffs have not attempted in their Complaint to pursue the claims or vindicate any rights belonging to other dealerships, so the issue Defendant raises concerning Plaintiffs' standing to do so is moot.

11

**V.  CONCLUSION**

For the foregoing reasons, the Court grants Defendant's Motion to Dismiss is granted in part and denied in part.  An appropriate Order follows.