**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BRUCE WEED, ET AL., : | |
| Plaintiffs, : | |
| : | CIVIL ACTION |
| v. : | |
| : | NO. 11-2808 |
| ALLY FINANCIAL INC., : | |
| Defendant. : | |

**MEMORANDUM AND ORDER**

Tucker, J.                                                                                             September ____, 2011

Presently before this Court is Defendant's Motion to Strike Plaintiffs' Demand for Trial by Jury (Doc. 14), Plaintiffs' Response in Opposition thereto (Doc. 20), and Defendant's Reply (Doc. 22). For the reasons set forth below, the Court grants Defendant's Motion.

**I.  BACKGROUND**

**A.  Factual Background**

Plaintiffs initiated this breach of contract and tort action against Defendant for allegedly engaging in bad faith conduct by targeting automobile dealerships, including their dealership, for termination, foreclosure, and liquidation in violation of the Pennsylvania Uniform Commercial Code and Pennsylvania common law.

Plaintiff Weed Chevrolet Company, Inc. ("Weed Chevrolet") is a Pennsylvania corporation that previously operated a motor vehicle dealership in Bristol, Pennsylvania. Plaintiff Bruce Weed, an individual residing in Pennsylvania, is President/CEO and a 33 1/3% stockholder of Weed Chevrolet. Plaintiff Michael David Weed, an individual residing in New Jersey, is Vice President and a 33 1/3% stockholder of Weed Chevrolet. Plaintiff Scott Weed, an

individual residing in Pennsylvania, is Secretary and a 33 1/3% stockholder of Weed Chevrolet. Plaintiff Weed[3] Properties, LLC ("Weed3 Properties") is a Pennsylvania limited liability company, in which the Weed Family are sole members. Defendant Ally Financial, Inc., formerly known as, inter alia, GMAC, Inc., ("GMAC") is a Delaware corporation that conducted business in Pennsylvania in connection with the transactions that are the subject of this action.

The facts giving rise to Plaintiffs' Complaint in the light most favorable to Plaintiffs are as follows. At all relevant times, GMAC provided wholesale inventory financing for the General Motors Corporation ("GM") dealership network, including floorplan and retail financing for Weed Chevrolet. Weed Chevrolet entered into its first financing agreement with GMAC in 1926, when GMAC was wholly owned by GM. Until the dealership closed in 2008, Plaintiff alleges that it was never in default or out of trust with GMAC.

Weed Chevrolet operated under a floorplan financing agreement with GMAC under the standard GMAC Wholesale Security Agreement ("WSA"). According to the WSA, GMAC was obligated to provide floorplan financing to Plaintiffs so long as Plaintiffs were not in default. Weed Chevrolet also had a Revolving Line of Credit Agreement ("RCA") with GMAC. In 2007, GMAC expanded the RCA from $200,000 to $350,000 and granted Weed Chevrolet a Commercial Real Estate Loan of $600,000 to enable the dealership to enhance its operations. The WSA, Real Estate Loan, and RCA were secured by a first and second mortgage ("collectively, the "Mortgage") on the real estate where Weed Chevrolet was located, which was owned by Weed Properties. As additional security, the Weed family also personally guaranteed all amounts owed to GMAC. Furthermore, on September 28, 2007, the parties entered into a Cross-Default, Cross-Collateralization and Guaranty Agreement ("Cross Collateralization

Agreement") covering all of the agreements.

In November 2006, GM finalized the sale of a 51% share of GMAC to a consortium of investors led by Cerberus Capital Management, LP, a private equity firm based in New York. After the sale, GMAC expanded the scope of its financing to include residential homes and other forms of consumer financing, ultimately becoming one of the largest sub-prime mortgage lenders in the country. With the collapse of the sub-prime mortgage industry in 2008, GMAC suffered an internal liquidity crisis. According to Plaintiffs, in an effort to address this crisis, GMAC undertook a massive program to terminate financing to more than 1,000 GM dealers, stripping those dealers of their associated collateral and closing down their financing, irrespective of whether the targeted dealers were in default. Plaintiffs allege that Weed Chevrolet was one of those targeted dealers.

In July 2008 (by letter pre-dated June 5, 2008), GMAC demanded that Weed Chevrolet execute an assignment of its GM Open Account. GMAC also reduced Weed Chevrolet's floorplan financing and RCA from $350,000 to $225,000; demanding that Weed Chevrolet deposit $465,000 by no later than August 15, 2008, as a condition for extending any of its floorplan or working capital financing going forward.[1]

GMAC claimed that it had identified certain performance issues with Weed Chevrolet and threatened to terminate all financing by August 15, 2008 unless Weed Chevrolet submitted an acceptable business plan showing that it was reducing costs and improving performance by

---

[1] By letter dated July 21, 2008, GMAC revised its demand for additional working capital to $250,000, with $125,000 to be deposited by August 15, 2008 and an additional $125,000 to be deposited by September 15, 2008. Plaintiffs allege that they were forced to use their personal assets and to sell inventory at a loss to generate immediate cash to meet the additional working capital demands.

that date. According to Plaintiff, when this threat was made, Weed Chevrolet was performing at levels consistent with its historical performance for that time of year and had already implemented a cost reduction program for 2008.

In October 2008, GMAC demanded that Weed Chevrolet make accelerated payments on all inventory and reduced its financing on all used vehicles. Neither of these demands was consistent with the WSA. Moreover, Plaintiffs were not in default on any agreements at the time the demands were made. To meet the new demands, Weed Properties and the Weed family proposed a deal to sell the real estate where Weed Chevrolet was located. Plaintiffs found an interested buyer and submitted the contract to GMAC for approval, but GMAC never responded.

In the same month, GMAC notified Plaintiffs that it was terminating the RCA. GMAC then gave Weed Chevrolet a 90-day notice that it was unilaterally terminating the WSA and would be ending all floorplan financing as of January 21, 2009. Left with no alternative, Weed Properties ultimately sold the real estate where the dealership was located with a fair market value of $6 million at a distressed price of $3.2 million. Weed Chevrolet also sold its dealership assets with a fair market value of $1.5 million at a distressed price of less than $100,000. The Weed family also drained personal assets to come up with the cash demanded by GMAC and avoid new penalties GMAC threatened to impose. Ultimately, Weed Properties had to borrow $1.15 million from a local bank to wind down the dealership and make accelerated payments to GMAC.

Plaintiffs contend that Defendant misled them and other targeted dealers into the mistaken, but reasonable, belief that if they acceded to Defendant's demands, Defendant would continue to provide financing essential for them to stay in business. Plaintiff alleges that

Defendant extorted accelerated principal payments and increased interest rates, additional collateral, penalty fees, and other cash payments from the targeted dealers, even dealers who were not in default, by threatening to terminate the dealers' wholesale and retail financing agreements and seize their entire inventories unless the dealers complied.  Plaintiffs contend that, in the absence of an actual default on any of the agreements, Defendant manufactured default as a pretext.  According to Plaintiffs, Defendant knew, but did not disclose, that once it forced the dealers to give Defendant everything they had, Defendant would terminate their financing and put them out of business.

### B.  Procedural History

On April 27, 2011, Plaintiffs filed a Complaint (Doc. 1) containing the following four counts: breach of contract and breach of implied covenant of good faith and fair dealing; tortious interference with contractual relations; fraud; and negligent misrepresentation.  Plaintiffs seek compensatory damages, including consequential damages; punitive damages; interest; and damages for the Weed Family's pain and suffering.  On June 3, 2011, Defendant filed a Motion to Dismiss (Doc. 12), which the Court granted in part and denied in part.  Specifically, the Court dismissed Plaintiffs' claim for negligent misrepresentation.

On June 7, 2011, Defendant filed a Motion to Strike Plaintiffs' Demand for Jury Trial (Doc. 14).  On July 20, 2011, Plaintiffs filed a Response in Opposition to Defendant's Motion to Dismiss (Doc. 21) and a Response in Opposition to Defendant's Motion to Strike (Doc. 20).  On July 27, 2011, Defendant filed a Reply with respect to its Motion to Strike (Doc. 23).  The Court now addresses this pending motion.

## II.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 39(a), where one or more of the parties has made an appropriate demand, the case is to be tried before a jury unless "the court upon motion or of its own initiative finds that a right of trial by jury of some or all of [the] issues does not exist under the Constitution or statutes of the United States." The right to trial by jury provided under the Seventh Amendment to the United States Constitution is fundamental and courts indulge every reasonable presumption against waiver. Henricks Commerce Park, LLC v. Main Steel Polishing Co., 2009 WL 2524348, at * 3 (W.D. Pa. Aug.18, 2009) (internal citations omitted). Nevertheless, this right may be waived by contract as long as it is done knowingly and voluntarily." Bishop v. GNC Franchising, LLC, 2006 WL 2266251 *2 (W.D.Pa. Jan.13, 2006) (citing AAMCO v. Marino, 1990 WL 10024 (E.D.Pa. Feb.7, 1990)).

Factors to consider in deciding whether a waiver is made knowingly and voluntarily are: (1) whether there exists gross disparity in bargaining power between the parties; (2) the business or professional experience of the party opposing the waiver; (3) whether the opposing party had the opportunity to negotiate contract terms; and (4) whether the clause containing the waiver was conspicuous. Cottman Transmission Systems v. McEneany, 2007 WL 119956,* 2 (E.D.Pa.,2007). A voluntary waiver may be inferred from the circumstances surrounding the agreement, and the party seeking to enforce the waiver bears the burden of proof. Henricks, 2009 WL 2524348, at * 3.

## III.  DISCUSSION
### A.  Parties' Arguments

Defendant contends that all of Plaintiffs' claims stem from several contracts mentioned in Plaintiffs' Complaint including the WSA, RCA and Real Estate Loan Agreement, and the Cross-

Collateral Agreement.  Defendant argues that in those contracts, Plaintiffs knowingly and voluntarily waived the right to a trial by jury.  To support this argument, Defendant points to specific language in each of the contracts as follows:

1. Paragraph 9 of the RCA which provides

   **The Borrower further waives the right to trial by jury as to any and all matters relating in any way to this Agreement to the extent permitted by law. The Borrower acknowledges that Borrower has consulted with counsel regarding this section and each and every other section of this Agreement.**

2. Paragraph Q of the Real Estate Loan Agreement which provides

   Borrower knowingly and voluntarily waives the following . . .

   **d. TO JURY TRIAL AS TO ANY MATTER RELATED TO OR ARISING UNDER OR RELATED TO THIS AGREEMENT OR THE LOAN;**

3. Page 2 of the Cross-Collateralization Agreement which provides

   *G.  <u>WAIVER OF RIGHTS TO TRIAL BY JURY.</u>  EACH DEALER WAIVES ITS RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING UNDER OR RELATED TO THIS AGREEMENT, ANY AND ALL SECURITY AGREEMENTS, ANY AND ALL OBLIGATIONS, AND ANY AND ALL CREDIT ACCOMMODATIONS.*

4. Paragraph 12(h) of the Guaranty which provides a waiver of

   THE RIGHT TO TRIAL BY JURY AS TO ANY AND ALL MATTERS RELATING IN ANY WAY TO THIS GUARANTY, TO THE EXTENT PERMITTED BY LAW.

Defendant further contends that all of the relevant factors support the validity and enforceability of the jury trial waiver.  First, Defendant contends, there was no gross disparity of bargaining power because Plaintiffs were experienced and sophisticated business people who had spent decades in the profession as evidenced by the many complicated agreements Plaintiffs had previously entered into with Defendant and Plaintiffs' ability to seek and receive million-dollar

financing commitments from lenders when necessary.  Defendant next argues that Plaintiffs had lengthy business and professional experience in that the signing individuals were owners and officers of their auto dealership and had a long history of professional dealings with Defendant.  Defendant further asserts that the clauses containing the waivers are conspicuous in that they are in caps, bold print, italics and/or underlined; are written in plain English; and are not buried in boilerplate language.  Finally, Defendant argues that there is some indication that Plaintiffs were able to negotiate the contract terms because they were able to go to another lender for significant financing and they expressly agreed that they had the opportunity to discuss the matters with counsel.

     In opposition, Plaintiffs first argue that because the WSA does not contain a jury waiver provision, they are entitled to a jury trial on their breach of contract claim arising under the WSA.  Plaintiffs next contend that they are not raising claims under the Guaranty Agreement, and therefore, the jury waiver clause found therein is irrelevant to Defendant's motion.  Plaintiffs go on to argue that the jury waiver provisions in the other agreements were not entered into knowingly, voluntarily or intelligently.  To support this argument, Plaintiffs contends that the balance of factors do not weigh in Defendant's favor.  Plaintiffs argues that (1) there was a gross disparity of bargaining power in that Plaintiffs relied upon Defendant's financing to sustain their business and once Defendant terminated that financing, Plaintiffs suffered substantial losses and eventually had to shut down the business; (2) they did not negotiate the jury waiver terms, they had no choice other than to accept those terms as written in the form agreements, and Bruce Weed was unaware that the contracts he signed even contained jury trial waivers; and (3) the jury waiver terms are not so conspicuous.  Plaintiffs concede that they had lengthy business and

professional experience. Plaintiffs further assert that, to the extent the jury waiver provisions are enforceable, the Court must determine to what extent the waivers apply to each of Plaintiffs' claims. Finally, Plaintiffs contend that because the jury waivers do not apply to all of Plaintiffs' claims, the Court should not strike its jury trial demand.

### B. Analysis

As an initial matter, the Court notes that the "Effect on Other Agreements" provision (paragraph E) of the Cross-Collateralization Agreement expressly states that it has the impact of amending and supplementing any and all security agreements existing prior to and after its execution. The WSA is a security agreement as defined by the Cross Collateralization Agreement.[2] Therefore, based on the plain language of the contract, the WSA was subsequently modified to include the jury waiver. Furthermore, given the sweeping language of the provision at issue, it is clear that all of Plaintiffs claims "aris[e] under or relat[e] to" this agreement.

After analyzing the relevant factors, the Court holds that Plaintiffs' waivers were made knowingly and voluntarily. First, the Court finds that there was no gross disparity in bargaining power between the parties. Plaintiffs contend that their reliance on GMAC financing for their on-going business is demonstrative of the unequal bargaining relationship between the two parties. Even if the Court accepts Plaintiffs' contentions as true, the relevant issue is not whether there was "unequal bargaining power," but whether there was a "gross disparity" of bargaining power.

---

[2] Section III of the Collateralization Agreement defines "Security Agreement" as any existing or future agreement between either Dealer or GMAC that creates or provides for a security interest in, or lien or other encumbrances on, any of the assets or property (tangible or intangible, real or personal) of either Dealer, including, without limitation, security agreements, deeds of trusts, mortgages, and agreements evidencing any and all Credit Accommodations.

See Cottman Transmission Systems, LLC v. McEneany, No. CIV.A.05-6768, 2007 WL 119956 (E.D. Pa. Jan. 4, 2007).  Here, the Court finds that no such gross disparity existed as evinced by Plaintiffs' eighty-two (82) year track record of successful business dealings with Defendant.

Secondly, the Court finds, and Plaintiffs concede, that their business and professional experience favors Defendant. Plaintiffs were clearly sophisticated business people with decades of experience in the profession. Thirdly, the waivers in the relevant documents (the Cross-Collateralization Agreement, the RCA and the Real Estate Loan Agreement) were conspicuous- as the provisions appeared in all-caps, bold and/or italics.

Finally, the Court also finds that Plaintiffs had an opportunity to negotiate the contract terms. Plaintiffs concede that they were in negotiation as to certain provisions of the agreement. The fact that negotiations did not pertain to every provision is not sufficient to nullify the contractual terms to which Plaintiffs knowingly and voluntarily agreed to be bound.

**IV.  CONCLUSION**

Based on the foregoing, the Court grants Defendant's Motion to Strike.  An appropriate Order follows.